Good morning, Your Honor. Good morning. We can hear you just fine. I hope you can hear me fine, Your Honor. Yes, we can hear you very well. Thank you. Thank you, Your Honor. If I may proceed. I may plead the court. The petitioner in this case believes that the DIA has gotten the issue in this matter quite wrong. There is no question as to the credibility of the petitioner before the immigration judge. Therefore, his testimony and his application in total has to be considered credible and accepted as fact. That being the case, it is hard to understand why the DIA chose to ignore certain evidence in the record that clearly demonstrates that this petitioner was persecuted, at least in part, on account of an imputed political opinion. Well, why do you say that? Where is the nexus between his deplorable treatment and the political opinion or the imputed political opinion? Where do you make the linkage? Well, I think the key language will be found on page 1.4 in the administrative record. And this is almost a year after the respondent first encountered the police while driving his truck. And after the incident, the police were shot at while chasing the respondent's truck. Now, the language here is the police officer who summoned the petitioner to the police station stated, and I quote, we have your record. You are collaborating with many things. That has been downplayed so much that the DIA would have the court understand that that has no meaning here. Excuse me. Let me interrupt. This is Judge Fletcher. First off, could I ask the deputy clerk to turn the volume down just a little bit? Thank you. And second, I didn't hear very well. What page of the administrative record are you reading from? It's page 124, line 17. 124? Line 17. Okay. Hang on a second. I'm a little slow. Okay. I'm now there. Okay. And so they say when he's, this is when they first have him in custody, when they pulled him in after they went through the roadblock. No. Okay. No, Your Honor. Okay. Place this quotation in context then. I'm sorry. This was in June of 2002. This is the police department in Hoshiarpur in Punjab. When the respondent was first pulled over, he was taken to a police station in Jammu and Kashmir. A different state. And at that time he was accused, of course, of being involved with the militants who were shooting at the police, and he denied it. And, of course, the government has argued that that is a legitimate police investigation, which is, on the face of it, seems to make sense. However, almost a year later, in June of 2002, in Punjab, in Hoshiarpur, this same petitioner was pulled into the police station, and the first thing the police officer says to him is, We have your record. We know that you are collaborating with the militants. Now, if the government wants to say that the first instance is due to police investigation, the second instance, I mean, was just a random shakedown, and they wanted to extort money from him because of the first instance. This third instance they want to characterize as an extortion event as well. But for this language here, that they know he's collaborating with militants, that statement in and of itself suggests that either they believe he has links with militants, or they're using the pretext of associating him with militants to extort money from him. Now, there is a case that was decided in this court back in 1998 called Ratna v. INS. In that case, the court held that torture, in the absence of any legitimate criminal prosecution, not investigation, prosecution, conducted at least in part on account of political opinion, provides a proper basis for asylum and reporting of deportation, even if the torture served intelligence gathering purposes. The government would have the court believe that all the police were doing back in 2001 was investigating a crime. Well, what about in 2002? There was no crime, and yet they are saying this guy is collaborating with militants and dragging him in. This is the incident that forced the petitioner to realize that if he continues to remain there, his life was going to be hell. He was going to be pulled in whenever they want, either use the pretext of him collaborating with militants to bash him on the head or extort money from him. And this court has decided in cases like Ratna that that is the basis for asylum, and that is what the IJ failed to see in this case, and I'm afraid that's what the DIA failed to see as well. The DIA downplayed the torture aspect of what the respondent went through in 2001. In fact, in the DIA's reputation of what happened to the respondent, which can be found on the administrative record on page four, the DIA listed certain things the police did to the petitioner, but did not mention the fact that the petitioner was tied upside down and then beaten on the soles of his feet. The process of being hung upside down by your feet, that in and of itself is designed to increase nothing but severe pain, and that is torture under the convention. So, Mr. Ariaki, excuse me. The petitioner believes the DIA got it all wrong. Excuse me, Mr. Doriaki. It's difficult since you're not here. My apologies for interrupting. This is Judge Block. Am I correct then in deducing that your whole argument rises or falls on that one statement that was made when he was picked up the second time that they believe that he was associating with militants, so to speak, and that you believe is an imputed political issue that would then qualify him for relief? I just want to understand the crux of what your contention is. Well, the petitioner was first detained in 2001. He was accused of being in league with a terrorist or a militant that shot at the police. And, of course, he explained that that was not the case. He denied it. But that incident, like I said previously, was downplayed because now the government can easily say that was police investigation. They were investigating a criminal activity that is shooting at the police. Yes, you're relying upon the second encounter then, basically, where they made reference to the fact that he was collaborating with militants as the crux of your argument. Am I correct in that? That was actually the third incident. The second incident took place at the border of Delhi and Hyderabad while he was driving to Agra. There, they just impounded his truck and only released it to him when he came back a few days later and paid them 60,000 rupees. The third incident is when he was summoned. They raided his home while he was at work and ordered him to appear at the police station. When he went to the police station, this was his home district in Rosharpur. When he went to the police station, that is when they told him, yes, we have your record. We know you're collaborating with the militants. In the second incident in Ghaziabad, he was also told that they have his record. But they did not detain him at that time and they only wanted to take money from him. And again, he paid them and he left. Now, what I'm trying to say here, in the third incident in his home district, in his hometown, the police now saying to him that they know he's collaborating with militants. And because of that, they are shaking him down. They are taking money from him. Now, this is going to be his life for the indefinite future. And he knows this. That is why he fled from India because he knew if he stayed there, these guys came to his home to get him. He wasn't there. They summoned him to the police. They will come back whenever they feel like it. And they will use this pretext. Whether it's true or not, whether they believe it or not, that he was collaborating with militants, they will use that against him. And what if he refuses to pay? What if he has no money to pay? Then, what's going to happen to him? He might get beaten up. He might get killed. And they already have the picture that he's collaborating with militants. Therefore, they kill him. They'll say, hey, he's just someone that got killed in a police encounter. That is why he fled. Excuse me for interrupting. This is Judge Fletcher again. You've got just a little bit of time left. Twenty-one seconds. Let's hear from the government, and then we'll give you a chance to respond. More than 21 seconds. We'll give you what time you need. But let's hear what the government has to say. Thank you, Your Honor. Thank you. So that seems to be the focus issue, right, whether or not that encounter qualifies for the requisite political opinion or imputed political opinion, the fact that they made reference to militants. What do you say about that? Good morning, Your Honor. May it please the Court. Sana Lee representing the Attorney General. It was a little difficult to hear all of the opposing counsel's arguments, but I'll try to respond to what I have. Well, the central argument, as I think Judge Block and I understand it, is that he recounts, and I'm on AR-124 question, and did they say why they wanted you to report every week? He answers, they said we have your records. You are collaborating with the militants. Right, Your Honor. Now, if they believe that he was collaborating with the militants, that sounds as though we've got a nexus. The IJ found there was no nexus, and the BIA agreed with that. So how do you respond? There is no nexus in this case, Your Honor. Well, that's a conclusion. So how do you respond to this specific statement where he says, you are collaborating with the militants, we have the records? Right. What do we do with that? Based on the record, the reason why the police made that statement is that originally he was accused of being connected to some people who had shot at the police, and so they investigated this incident of the shooting, and the police believed that those shooters were extremists. And that's the whole reason that petitioner was. Well, of course, that's the narrative as to why he was stopped. His story is, I gave these guys a ride. I didn't realize at the time that there were militants. We come to the checkpoint. One of them holds a gun to my head, says keep on driving, which he does. He drives to the checkpoint. They catch up with him and stop, and for understandable reasons, the police think at that point that he's involved with the militants because he's gone on through. He says, well, I told them that I wasn't. They eventually let me go. But now here apparently they say, later on, you are collaborating with militants. So I don't understand how the narrative you just gave me negates the statement they made to him, you are collaborating with militants. Because when the petitioner was released by the police, a policeman told him, oh, I believe what you were saying. I know that you didn't shoot at us. Okay. Where is that statement in the record? Well, that statement is in his affidavit. Okay. I've got the record. Could you give me the page? I want to read it. Okay. It's page 222. Hang on a sec. 222. Okay. I'm there. Right. The first full paragraph, he says, on July 13th, 2001, a constable came to me and said that he knew that I did not know anything. And then the constable asked for a bribe so the petitioner could be released. And also in petitioner's testimony, he said that it appears to be the same constable told him, oh, I think I know you're a decent man, which appears to be what he was relating in his affidavit, that they knew that he was not connected to this crime, except for the fact that he was forced to give them a ride and that he was not an extremist or a militant. And so after petitioner was released, the police used this incident as leverage to extort money from him. And that's what happened in the second incident where he paid money. He paid like 50,000 rupees or something like that to be released from the second incident. And in the third incident, the same thing happened. So what the police were saying is that we know you were involved in this investigation before of this criminal matter where somebody shot at the police, and so we're going to use this information against you to harass you and extort money from you. You said that's what they said to him. There's nothing in the record that says that's what they said to him in the third instance. What he says and what's in the record is what they said to him is we have the record and you were collaborating. Now, you're imputing to the police on the third incident what you say, but that's not what he says they said. Right. He says that they said you were collaborating with the militants, which, you know, could be his way of saying, well, they know that he was involved in this incident with people who were suspected to be extremists, but they were actually criminals who had shot at the police. But you keep saying it could be interpreted. No, but that's not what he said. He said we have the records. You were collaborating with the militants. Now, collaborating with the militants, even if he was not, if that's what they think, it's imputed political opinion. One of the things that bothers me about this case is that the IJ in recounting the evidence does not recount this, nor does the BIA. The BIA did, Your Honor. Where is the BIA? Let's see. It's on page two of their decision. OK. Right. OK. In the in the first paragraph. Yeah, no, I get it. OK. That's right. OK. So the board says, although on one occasion the police said that the respondent was collaborating with militants, the police also stated that the respondent was a decent man. He was not lying and released him from custody after his wife made an extortion payment and thereafter sought more extortion payments. So the board explicitly considered that statement that the respondent. I take it back. Yes, the IJ didn't. But the BIA did consider that. Yes, Your Honor. But if he's credible, how can they disregard it? I don't think that they're disregarding it, Your Honor. They're. They're just not believing it? They're weighing it against all the other facts in the record. And in their view, the petition, the this statement does not mean that the police were imputing an opinion to him. It was more about knowing that he was involved in this criminal matter. Well, as I see the record, what we have is two different police officers. What I suspect are two different police officers or two different encounters with the police. The first time around after investigation, he says that they conclude that he's not involved. On the other hand, after concluding that they're not involved, they want a lot of money. Well, maybe that is they thought he was involved, but they'll say you're not because they prefer to have the money. I mean, who knows? Second time around, I don't know. Third time around, he says they say you're collaborating and they want money. I mean, how are we to know from that that in fact they didn't think he was collaborating because they have a very clear statement the third time around that they say they think he was collaborating. Now, let me do it this way as to putting to one side which one we believe. If the only evidence we had in the record as to the view of the police was the police think he is collaborating and they mistreat him, is that sufficient nexus? If the police believe that he's collaborating with militants? If the only evidence we have is his statement that the police say to him that they believe that he is collaborating, is that sufficient to establish nexus? Not in this case, Your Honor, because those. I'm sorry, not in this case. I'm saying if the only evidence we had in this case was the police saying to him we have the records, you are collaborating with the militants, is that sufficient to establish nexus? If you don't consider the police investigation of the crime. That's exactly my hypothetical. I think it could be. What do you mean could be? On what basis could it not be if the only evidence we have is the statement from the police that he recounts that they say you were collaborating? Right. Your Honor, I think, yes, it would be evidence of a nexus. But in this case, there is a lot of other evidence that. Yes. So the question then is what do we do when we have some police officers who say we believe you weren't involved and one officer at least who says we have the records you were involved. So that's what we have to do. We have to defer then to the BIA that didn't hear the witness when the IJ doesn't say anything about it, that the IJ says that statement we can disregard. I don't think that the IJ was saying that that statement should be disregarded. Well, the IJ doesn't mention it, so I'm focused on the IJ. Well, Your Honor, the IJ, I mean, the IJ did consider the record and consider the fact that the Petitioner said, well, this officer said I was a decent person and, you know, that's why they released him, because they didn't believe that he was involved in this crime. So if I may, so this possibly presents this type of conflict. You have two sets of police officers, arguably, I guess, right? And one says we know you were not complicit, and then on another occasion a different group of police officers, you know, take a different spin on all of this. I guess that's the tension that we have to deal with here. And there was a credibility finding, so everything that he said has to be credible. So if you have this tension and this conflict here between these two different events, how do we go about resolving this as an appellate court? Well, the record has to compel the conclusion that there's an imputed nexus in this case, and that's a – it is a high standard. Also, the first incident involves the police who actually conducted the investigation and they interrogated the Petitioner. They were on the spot. Right. They were on the spot. This testimony, they said we know that you're not, you know, involved in this event. So the people who were there on the spot made that statement, which we have to credit. Later on, a year later, a different group of people who are now apparently there but are relying on the record say something that arguably puts this into play, but they're relying upon the record that establishes, I guess, you know, according to his testimony that he was not complicit. I guess I'm trying to resolve these conflicting scenarios. Well, that's how the board resolved the scenario, is that based on this first incident, the investigation showed the Petitioner was not involved in the shooting, and they believed his account that he was forced to give them a ride to these shooters. And in the last incident, the police officer who probably was not at the first incident. They used that to shake him down. Yes, Your Honor. They just took the information from the record that he was connected to these people but then was ultimately released by the police who investigated the crime. They used this information to scare the Petitioner into giving them money. Yeah, and the problem is not resolved entirely by the finding that the Petitioner is credible because the real question, as it now presents to us, is whether or not the police officers were credible. I mean, did they believe that he was collaborating when they say the third time? Did they believe the first time around that he wasn't collaborating? And we don't have an adverse credibility finding. The credibility finding we have is with respect to him, not with respect to the officers whose statements he's recounting. Right, Your Honor. So the board and the IJ in this case took the last police officer's statement to mean that, well, they knew that he was innocent. So the board decides that in the third encounter the police officers are lying. Basically, Your Honor. And we're supposed to accept the BIA's conclusion that the third encounter police officers are lying. Yes, Your Honor. Okay, got it. Okay. Thank you. You're welcome. Now, we stopped you with 21 seconds left to go, but please have rebuttal, and you needn't confine yourself to 21 seconds. So thank you. Okay, thank you, Your Honor. Thank you, Your Honor. First of all, I want to refer to the reference the BIA made to the fact that the police said the respondent was collaborating with medicine. The BIA made that reference and took it out of context. If you read on the administrative record in that first paragraph of the BIA's decision on page 2 of this decision, it's talking about although on one occasion the police said that the respondent was collaborating with medicine and referring to the respondent's brief, the police also stated that the respondent was a decent man who was not lying. Well, the police stated that the respondent was a decent man in July of 2001. This was at the first incident. This was in a different state in India. The statement, we have your record, we know you are collaborating with medicine, that was done almost a year later in a different state by a different police department in the town where the respondent lived, in Oshapo, in Punjab. Now, the statement made in Punjab in no way suggests that the police in Punjab believe that the respondent was a decent man or was not involved with medicine. It states on its face that we have your record, we know you are collaborating with medicine. And that is the problem. Now, facing the consequences of that statement, the respondent had no choice but to flee from that place because he knew, now they've come to his home, now they're going to be getting him every time or every chance they get. And that is what he was afraid of. That statement suggests that the police in Punjab think he's collaborating with medicine and they're going to use that information to their own end, whether it's extorting money from him or using that as a pretext to beat the crap out of him, pardon my language, from time to time, whenever they see fit. And this is why the respondent fled. This is why he came and applied for asylum. Excuse me for interrupting. Thank you very much for the argument. We fully appreciate the points you've made, and the case is now submitted. Thank you, Your Honor. Thank you.
judges: Block, Trott, Fletcher